UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| TONY A. IRVINE,<br><br>　　　　Plaintiff,<br><br>　v.<br><br>DUSTIN COOK; the CITY OF IDAHO FALLS; and JOHN DOES I-X,<br><br>　　　　Defendant. | Case No. 4:22-cv-00218-AKB<br><br>**MEMORANDUM DECISION AND ORDER** |

# I.  INTRODUCTION

Before the Court are Defendant City of Idaho Falls' Motion for Summary Judgment (Dkt. 30) and Plaintiff Tony A. Irvine's Motion to Exclude Matthew R. Bloodgood (Dkt. 32). The Court heard oral argument on January 19, 2024, and the matter is now ripe for decisions. For the reasons set forth below, the Court grants the City's summary judgment motion. Because the decision granting the City summary judgment renders Bloodgood's testimony irrelevant, the Court will grant Irvine's motion to exclude Bloodgood's testimony.

# II.  BACKGROUND

## A.  Factual Background

### 1.  The Seizure

On July 14, 2020, Defendant Officer Dustin Cook of the Idaho Falls Police Department (IFPD) received a call from dispatch advising him of a "disturbance" between two males in the Walmart parking lot on Utah Avenue in Idaho Falls. Cook was told that one man had a bat and that the disturbance had turned "physical." Dispatch did not give additional details.

When Cook arrived, he says he observed a man holding a bat and another man standing 30 feet away, yelling. Cook commanded the man with the bat to put the bat down. The man complied. According to Cook, while he was ordering the man with the bat to put it down, the other man picked up his bicycle and started to ride away. (Dkt. 30-4 at p. 41, Cook Dep. 31:13-32:22). Cook yelled at him to stop. (*Id.*). He did not stop. Cook yelled at him to stop again, but the man

continued riding away on his bicycle. Cook then chased after the man and pushed him off his bicycle to "prevent him from leaving," so he could investigate the disturbance.

The man Cook pushed off his bicycle was the Plaintiff, Tony Irvine. When Cook interviewed Irvine, Cook noted Irvine had abrasions on his right shoulder and forehead. (*Id.* at p. 45, Cook Dep. 35:3-8). Irvine was also complaining about being in pain. An ambulance was called to address Irvine's injuries, but he refused transport to the hospital and, instead, road away on his bicycle. (*Id.* at p. 46, Cook Dep. 36:1-13).

According to Irvine, when Cook arrived on the scene, Irvine was already riding away from the scene on his bicycle, hoping to remove himself from the confrontation with the man with the bat. (Dkt. 30-4 at pp. 174-81). That Irvine was 30 feet away from the man with the bat when Cook arrived is undisputed. (Dkt. 7-3 at p. 5). Irvine also testified he did not hear Cook's commands to stop. (Dkt. 30-4 at pp. 175-76, Irvine Dep. 28:25-29-1). Cook did not issue any citations to anyone regarding the incident between Irvine and the man with the bat. (*Id.* at pp. 58-59, Cook Dep. 48:20-25-49:1-3).

### 2.     The Aftermath

Following Cook's seizure of Irvine, Cook drafted his police report detailing the incident. A sergeant reviewed the report. Then, IFPD procedure required a lieutenant to review Cook's use of force. No violation of IFPD policy was reported during this review process. (*Id.* at pp. 112-18, 30(b)(6) Deposition of Bryce Johnson). Captain Jeremy Galbraith also reviewed Cook's report and the associated documents and bodycam footage after the City received Irvine's notice of tort claim. (*Id.* at p. 91, 30(b)(6) Deposition of Bryce Johnson, 21:2-24). Chief Bryce Johnson discussed the review with Captain Galbraith and concluded there was no need to conduct a further investigation. (*Id.* at p. 107, 30(b)(6) Deposition of Bryce Johnson, 37:15-24).

### B.     Procedural Background

On May 28, 2022, Irvine filed his Complaint against Cook and the City, alleging claims under 42 U.S.C. § 1983 for violations of his Fourth and Fourteenth Amendment rights to be free from unreasonable search and seizure and the use of excessive force. Irvine moved for partial summary judgment, seeking summary judgment on his Fourth Amendment claims against Cook in his individual capacity for unreasonable search and seizure and excessive force, and the Court granted that motion. (Dkt. 25). The City now moves for summary judgment on the claims against it. (Dkt. 30). It contends Irvine has failed to submit evidence that the City had a custom or policy

causing Irvine's claimed damages, or alternatively, that a City official with final policymaking authority ratified Cook's actions. The City asserts that, absence such evidence, it is entitled to summary judgment.

### III.  LEGAL STANDARD

Summary judgment is appropriate where a party can show that, as to any claim or defense, "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). One of the principal purposes of the summary judgment "is to isolate and dispose of factually unsupported claims . . . ." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323-24 (1986). It is not a "disfavored procedural shortcut," but is instead, the "principal [tool] by which factually insufficient claims or defenses [can] be isolated and prevented from going to trial with the attendant unwarranted consumption of public and private resources." *Id.* at 327. "[T]he mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986). There must be a genuine dispute as to any material fact—a fact that may affect the outcome of the case. *Id.* at 248.

The evidence must be viewed in the light most favorable to the nonmoving party, and the Court must not make credibility findings. *Id.* at 255. Direct testimony of the nonmovant must be believed, however implausible. *Leslie v. Grupo ICA*, 198 F.3d 1152, 1159 (9th Cir. 1999). On the other hand, the Court is not required to adopt unreasonable inferences from circumstantial evidence. *McLaughlin v. Liu*, 849 F.2d 1205, 1208 (9th Cir. 1988).

The Court must be "guided by the substantive evidentiary standards that apply to the case." *Liberty Lobby*, 477 U.S. at 255. If a claim requires clear and convincing evidence, the question on summary judgment is whether a reasonable jury could conclude that clear and convincing evidence supports the claim. *Id.*

The moving party bears the initial burden of demonstrating the absence of a genuine dispute as to material fact. *Devereaux v. Abbey*, 263 F.3d 1070, 1076 (9th Cir. 2001) (en banc). To carry this burden, the moving party need not introduce any affirmative evidence (such as affidavits or deposition excerpts) but may simply point out the absence of evidence to support the nonmoving party's case. *Fairbank v. Wunderman Cato Johnson*, 212 F.3d 528, 532 (9th Cir. 2000).

**MEMORANDUM DECISION AND ORDER** - 3

The burden then shifts to the nonmoving party to produce evidence sufficient to support a jury verdict in that party's favor. *Deveraux*, 263 F.3d at 1076. The nonmoving party must go beyond the pleadings and show "by . . . affidavits, or by the depositions, answers to interrogatories, or admissions on file" that a genuine dispute of material fact exists. *Celotex*, 477 U.S. at 324.

The Court is "not required to comb the record to find some reason to deny a motion for summary judgment," however. *Carmen v. San Francisco Unified Sch. Dist.*, 237 F.3d 1026, 1029 (9th Cir. 2001) (quotation omitted). Instead, the "party opposing summary judgment must direct [the Court's] attention to specific, triable facts." *Southern California Gas Co. v. City of Santa Ana*, 336 F.3d 885, 889 (9th Cir. 2003).

Only admissible evidence may be considered in ruling on a motion for summary judgment. *Orr v. Bank of America*, 285 F.3d 764, 773 (9th Cir. 2002); *see also* Fed. R. Civ. P. 56(e). In determining admissibility for summary judgment purposes, the court considers the contents of the evidence rather than its form. *Fraser v. Goodale*, 342 F.3d 1032, 1036-37 (9th Cir. 2003). If the contents of the evidence could be presented in an admissible form at trial, those contents may be considered on summary judgment even if the evidence itself is hearsay. *Id.* (affirming consideration of hearsay contents of plaintiff's diary on summary judgment because at trial, plaintiff's testimony of contents would not be hearsay).

## IV.  ANALYSIS

### A.   City of Idaho Falls' Motion for Summary Judgment

Section 1983 provides a cause of action against any "person" who, under color of law, deprives any other person of rights, privileges, or immunities secured by the Constitution or laws of the United States. The term "person" includes municipalities. *Monell v. Dep't of Soc. Serv. of N.Y.*, 436 U.S. 658, 701 (1978). A municipality cannot, however, "be held liable under § 1983 on a respondeat superior theory." *Id.* at 691; *accord Bd. of Cnty. Comm'rs v. Brown*, 520 U.S. 397, 403 (1997) ("We have consistently refused to hold municipalities liable under a theory of respondeat superior."). Rather, a plaintiff seeking to impose liability on a municipality under § 1983 is required to identify a municipal policy or custom which caused the plaintiff's injury. *Brown*, 520 U.S. at 403. A *Monell* claim may be stated under three theories of municipal liability: (1) when official policies or established customs inflict a constitutional injury; (2) when omissions or failures to act amount to a local government policy of deliberate indifference to constitutional rights; or (3) when a local government official with final policy-making authority ratifies a

MEMORANDUM DECISION AND ORDER - 4

subordinate's unconstitutional conduct. *Johnson v. Shasta Cnty.*, 83 F. Supp. 3d 918, 930 (E.D. Cal. 2015).

1.   **Policy or Custom**

Irvine contends IFPD has a policy of authorizing arrests "merely for yelling in public." (Dkt. 31 at p. 4). He bases this assertion on the deposition testimony of Chief Johnson, who testified:

> Q.   Was it consistent with the IFPD policy to arrest somebody for—aside from the COVID 19 policy, to arrest someone for disturbing the peace simply for yelling?
>
> A.   You can. I think there's more nuance and context in most of those cases. I think you would have to articulate it back to how the peace is being disturbed, like yelling and engaging in some sort of fighting behavior. So, like I said, I think if you take the totality of the circumstances, I don't think he was responding to someone just yelling. He was responding to what was dispatched as a fight, a fight call. So if you take all of the known facts that I can see there, I think there's a probable cause for that, yeah.

(Dkt. 30-4 at pp. 103-02, 33:17-34:7). Irvine is correct that yelling, by itself, is not a crime, and therefore it is not an arrestable offense. Chief Johnson, however, did not articulate an IFPD policy authorizing arrests for mere yelling in public, contrary to Irvine's argument. Rather, Chief Johnson made clear that a violation for disturbing the peace may involve yelling but generally requires more, such as "some sort of fighting behavior."

Chief Johnson's explanation of the conduct which may constitute disturbing the peace comports with the statute criminalizing disturbing the peace, which provides in relevant part:

> Every person who maliciously and willfully disturbs the peace or quiet of any neighborhood, family or person, by loud or unusual noise, or by tumultuous or offensive conduct, or by threatening, traducing, quarreling, challenging to fight or fighting, or fires any gun or pistol, or uses any vulgar, profane or indecent language within the presence or hearing of children, in a loud and boisterous manner, is guilty of a misdemeanor.

Idaho Code § 18-6409(1).

As this section illustrates, yelling which equates to "threatening, traducing, quarreling, challenging to fight or fighting" may constitute disturbing the peace. *Id.* Contrary to Irvine's argument, Chief Johnson did not testify the IFPD had or has an official, unconstitutional policy authorizing arrests for merely yelling in public. Instead, any department policy, as Chief Johnson explained, is more "nuanced" and requires an officer "to articulate it back to how the peace is being disturbed."

**MEMORANDUM DECISION AND ORDER - 5**

For similar reasons, Irvine's argument that the IFPD has an unofficial, unconstitutional policy of allowing its officers "to arrest and use physical force against citizens for refusing a command to stay put for questioning" is, likewise, unavailing. Irvine again relies on Chief Johnson's deposition testimony to argue the IFPD had an official policy of allowing an officer to arrest someone for refusing to stop when commanded. Regarding the policy, Chief Johnson testified:

> Q. Was the policy of the [IFPD] in July of 2020 that an officer could arrest or detain a subject merely because they failed to obey a command to stay put?
>
> A. *If it was a lawful command based off of investigative reason*, I believe that's the purpose of that resisting and obstruction law, is to allow us then reasonable suspicion. Because in a reasonable suspicion case, we can detain people to get their information to investigate. So if they fail to do that and flee and leave, then, yes, we do use the resisting and obstruction code for those type of instances.

(Dkt. 30-4 at p. 105, 35:12-24) (emphasis added).

This testimony establishes IFPD's policy is constitutional. Chief Johnson premised his statement that an officer could arrest an individual who attempted to flee a scene for resisting arrest or obstruction only if the officer had a reasonable suspicion to detain the individual to stop in the first place. Where an officer has a reasonable suspicion to perform an investigative stop, an officer may lawfully order that individual to stop; if the individual refuses, the officer may arrest that person with resisting and obstruction under I.C. § 18-705.

In this case, the Court found Cook had neither probable cause nor reasonable suspicion to detain Irvine in the first instance. For this reason, the Court concluded Cook had no lawful basis to command Irvine to stop, and his seizure of Irvine was therefore unconstitutional. This conclusion, however, does not equate to a conclusion that the IFPD policy was unconstitutional and that this unconstitutional policy was the "moving force" behind the violation of Irvine's rights. As the City notes and the Supreme Court has recognized, "adequately trained officers occasionally make mistakes; the fact that they do says little about the training program or the legal basis for holding the city liable." *City of Canton, Ohio v. Harris*, 489 U.S. 378, 391 (1989).

### 2. Ratification

Alternatively, Irvine argues Chief Johnson "ratified" Cook's conduct by failing to discipline and provide him with training after the incident. The IFPD conducted two investigations of the incident. The first was performed by Captain Galbraith, a member of the IFPD Professional

Standards Bureau. (Dkt. 31-1 at ¶ 13). Captain Galbraith prepared a report after reviewing Cook's reports, the available body cam footage, and Irvine's Notice of Tort Claim. (*Id.*). Also, Captain Tisdale prepared a timeline of events. (Dkt. 31-1 at ¶ 15). Chief Johnson, who has final policy-making authority, reviewed both Captain Galbraith's report and Captain Tisdale's timeline and concluded Cook's conduct complied with IFPD policy. (Dkt. 31-1 at ¶ 16). Additionally, Cook's supervisor, Jed Lewis, performed a separate "administrative review," evaluated the same reports and body camera footage, and concluded Cook followed IFPD policy. (Dkt. 31-1 at ¶ 19). Because Chief Johnson concluded Cook had not violated IFPD policy, he took no remedial action against Cook for his treatment of Irvine.

A plaintiff may establish municipal liability by demonstrating an official with final policy-making authority "ratified the decision of a subordinate." *Ulrich v. City & County of San Francisco*, 308 F.3d 968, 984-85 (9th Cir. 2002). To show ratification, a plaintiff must prove the "authorized policymakers [approved] a subordinate's decision and the basis for it." *Christie v. Iopa*, 176 F.3d 1231, 1239 (9th Cir. 1999) (citing *City of St. Louis v. Praprotnik*, 485 U.S. 112, 127 (1988)); *accord Trevino v. Gates*, 99 F.3d 911, 920 (9th Cir. 1996). "Ordinarily, ratification is a question for the jury." *Christie*, 176 F.3d at 1238-39. As with any jury question, however, "plaintiff must establish that there is a genuine issue of material fact regarding whether a ratification occurred." *Id.* at 1239.

A plaintiff may establish the existence of a de facto policy or custom through ratification based on post-event conduct, including a defendant's conduct in investigating the incident. *Henry v. Cnty. of Shasta*, 132 F.3d 512, 518 (9th Cir.1997), *opinion amended on denial of reh'g*, 137 F.3d 1372 (9th Cir.1998). "[T]hat a policymaker's mere refusal to overrule a subordinate's completed act does not constitute approval," however, is well-settled. *Christie*, 176 F.3d at 1239. As the Ninth Circuit has stated, "[t]o hold cities liable under section 1983 whenever policymakers fail to overrule the unconstitutional discretionary acts of subordinates would simply smuggle respondeat superior liability into section 1983." *Weisbuch v. Cnty. of Los Angeles*, 119 F.3d 778, 781-82 (9th Cir. 1997) (citation and internal quotation marks omitted); *accord Gillette v. Delmore*, 979 F.2d 1342, 1348 (9th Cir. 1992). Likewise, the Ninth Circuit "appears to require something more than a failure to reprimand to establish a municipal policy or ratification." *Kanae v. Hodson*, 294 F. Supp. 2d 1179, 1189 (D. Haw. 2003).

In *Henry*, for example, the plaintiff was stopped for a broken taillight. 132 F.3d at 514. When the plaintiff refused to sign the traffic ticket and demanded to be taken before a magistrate, the officer arrested the plaintiff and took him to the county jail, where he was stripped, paraded around the jail naked and held, without a blanket, in an unheated, "urine-coated" rubber room for nearly ten hours. *Id.* at 515-16. A jail deputy threatened to leave the plaintiff in the padded cell "naked" and "indefinitely," without access to a judge, until the plaintiff agreed to sign paperwork that he could not read without glasses and that no one would read to him. *Id.* at 516. Numerous county personnel were involved in the incident, acting over a long period of time. *Id.* at 518. None of them were reprimanded afterwards. *Id.* The plaintiff also presented evidence of other individuals subjected to nearly identical treatment after being arrested for minor traffic violations. *Id.* at 518-19. Based on this evidence, the Ninth Circuit found factual issues were presented indicating the county's treatment of the plaintiff was part of a pattern and custom rather than an isolated incident. *Id.* at 521.

Similarly, in *Larez v. City of Los Angeles*, 946 F.2d 630, 646-47 (9th Cir. 1991). the Court upheld a jury verdict holding the City of Los Angeles and the chief of the Los Angeles Police Department (LAPD) liable in his official capacity for individual officers' use of excessive force based, in part, on the police chief's post-hoc exoneration of the officers. The plaintiff, Jessie Larez, lodged a complaint with the LAPD, claiming he had suffered a broken nose and injuries to his knees and neck which required surgery after officers hurled him across the room, grabbed him by the hair, and forced him to lie face down on the floor during a search of his home. *Id.* at 634. During the search, the officers "laughed and sneered" at Larez, and one officer threatened him with a service revolver, pointing it at his head and telling him, "I could blow your fucking head off right here and nobody can prove you did not try to do something." *Id*. The police chief later notified Larez in a letter that none of his allegations could be sustained. *Id.* at 635.

After Larez prevailed in a bifurcated trial against the individual officers, Larez tried his claims against the police chief and the city. *Id.* Larez's expert testified that, under the LAPD citizen complaint procedure, "it was 'almost impossible for a police officer to suffer discipline as a result of a complaint lodged by a citizen,' noting that it was as if 'something has to be done on film for the department to buy the citizen's story.'" *Id.* at 647. The expert also noted "holes" and "inconsistencies" in the post-incident investigation of Larez's complaint, which "should have been visible to any reasonable police administrator." *Id.* at 647. Based on the expert testimony noting

the numerous flaws in the LAPD's investigative process, which almost always exonerated the officers, and the police chief's "condonation of, and acquiescence in, the officers' use of excessive force," the Ninth Circuit concluded that the jury's verdict holding the city and police chief liable "did not constitute plain error." *Id.*

As these two cases illustrate, "something more" than a single failure to reprimand is needed to infer a policy or custom for § 1983 purposes. *See Kanae*, 294 F. Supp. 2d at 1191 (explaining Ninth Circuit case law "clearly" requires "something more than a failure to discipline" to establish a § 1983 ratification claim). In *Henry* and *Larez*, the plaintiffs presented evidence of "something more." In *Henry*, the plaintiff presented evidence that numerous county employees participated in serious constitutional violations, which occurred over a "lengthy" period of time, and that "nearly identical" incidents had occurred in the past without county personnel suffering any consequences in any of those instances. In *Larez*, the plaintiff presented evidence of an obviously flawed investigation, which the police chief accepted without question. Evidence was also introduced indicating that LAPD officers could use excessive force with impunity and almost always escape discipline.

Here, by contrast, Irvine has not offered sufficient evidence of "something more" than a failure to discipline Cook, as required by the Ninth Circuit. "The law does not say that every failure to discipline an officer . . . is evidence of a 'whitewash' policy or some other policy of 'sham investigations,'" or that a failure to discipline an officer in one instance otherwise establishes a policy for which a city may be held liable under § 1983. *Kanae*, 294 F. Supp. 2d at 1191 (explaining Ninth Circuit case law "clearly" requires "something more than a failure to discipline" to establish a § 1983 ratification claim). "The law clearly requires something more." *Id.* (internal quotation marks omitted).

Unlike *Henry* and *Larez*, Irvine presents no evidence of "something more." For example, this case does not involve repeated acts of abuse by multiple officers, in several episodes, over a lengthy timeframe. Cook made a split-second decision to run after Irvine and push him off his bike to keep him from leaving the scene. Such conduct was not so "incompetent and catastrophic" or "so gross of an abuse of the use of deadly weapons" that any reasonable administrator should have known that he should do something about it. *See Grandstaff v. City of Borger, Tex.*, 767 F.2d 161, 171 (5th Cir. 1985) (*cited with approval in Larez*, 946 F. 2d at 647 and *McRorie v. Shimoda*,

**MEMORANDUM DECISION AND ORDER - 9**

795 F.2d 780, 784 (9th Cir. 1986)). Nor has Irvine presented evidence of prior misconduct within the IFPD or that officers always escape discipline for misconduct, like in *Larez*.

At most, Irvine has shown that the IFPD failed to discipline Cook in this one specific instance. In other words, Irvine has failed to submit evidence suggesting constitutional violations were so widespread and a failure to discipline was so pervasive that they could give rise to an inference of supervisory encouragement, condonation, or acquiescence amounting to a custom or policy for *Monell* purposes. Although some municipal pronouncements ratifying a subordinate's action could be tantamount to the announcement or confirmation of a policy for purposes of *Monell*, here no facts in the record suggest the single failure to discipline Cook rises to the level of such a ratification. *Haugen v. Brosseau*, 339 F.3d 857, 875 (9th Cir. 2003) (citing *Santiago v. Fenton*, 891 F.2d 373, 382 (1st Cir. 1989) (refusing to hold that the "failure of a police department to discipline in a specific instance is an adequate basis for municipal liability under *Monell*"). Accordingly, the Court grants the City summary judgment.

**B.     Irvine's Motion to Exclude**

Irvine moves to exclude the testimony of Defendants' expert, Matthew R. Bloodgood, on the grounds that his testimony is irrelevant and, thus, inadmissible under Rule 702 of the Federal Rules of Evidence. Defendants retained Bloodgood, a former police officer and trainer of police officers, to opine on "the reasonableness of [Cook's] use of force." (Dkt. 32-2 at p. 6). More specifically, Bloodgood opines that Cook was justified in using a reasonable amount of force to stop Irvine from leaving the scene of a reported crime and that Cook had probable cause to arrest Irvine under I.C. § 18-705, for resisting and obstructing an officer.

Under Rule 702, the evidence offered by the expert must assist the trier of fact either to understand the evidence or to determine a fact in issue. *Primiano v. Cook*, 598 F.3d 558, 563 (9th Cir. 2010) (citing Fed. R. Evid. 702). "The requirement that the opinion testimony assist the trier of fact goes primarily to relevance." *Id.* at 564. Expert testimony that does not relate to any issue in a case is not relevant and, therefore, not helpful to a jury. *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 591 (1993).

The Court's prior decision granting partial summary judgment in favor of Irvine on his claims against Cook and its decision here granting summary judgment for the City renders Bloodgood's opinions irrelevant to any remaining issues in this case. Defendants contend Bloodgood's opinions are relevant to the issues of the reasonableness of force and probable cause

...
...

"in the context of the policies of the City of Idaho Falls Police Department and how those policies impacted Cook's interactions with Plaintiff on July 14, 2020." (Dkt. 34 at p. 3). This decision resolves those issues in the City's favor, however, leaving damages as the only remaining issue, and none of Bloodgood's opinions pertain to damages. Because Bloodgood's proposed testimony does not relate to any remaining issue in the case, the Court excludes his testimony under Rule 702.

## V.  ORDER

**IT IS ORDERED that:**

1. Defendant City of Idaho Falls' Motion for Summary Judgment (Dkt. 30) is **GRANTED**.
2. Plaintiff Tony A. Irvine's Motion to Exclude Matthew R. Bloodgood (Dkt. 32) is **GRANTED**.

DATED: January 25, 2024

Amanda K. Brailsford
U.S. District Court Judge